**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**WESTERN DIVISION**

TERRY CAUSEY                                                                      PLAINTIFF

v.                                                        CIVIL ACTION NO. 5:14cv76-MTP

CAROLYN W. COLVIN                                                          DEFENDANT

## OPINION AND ORDER

Plaintiff Terry Donald Causey ("Causey") brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying his claim for social security disability insurance benefits. This matter is now before the Court on the Motion for Summary Judgment [10] filed by the Plaintiff and the Motion to Affirm the Commissioner's Decision [13] filed by the Defendant. Having carefully considered the pleadings, the record and the applicable law, and being fully advised in the premises, the Court finds that the Motion for Summary Judgment [10] should be DENIED and the Motion to Affirm the Commissioner's Decision [13] should be GRANTED.

## PROCEDURAL HISTORY

On March 31, 2009, the Plaintiff filed for a period of disability, disability insurance benefits and supplemental security income with an alleged onset date of March 24, 2009. (Administrative Record [9] at 291-336.)[1] The Plaintiff stated that he was disabled because of spine disease, asthma, shortness of breath, and hemmorhoids. ([9] at 328.) This application was denied initially and upon reconsideration. ([9] at 240-45; 251-54.) Thereafter, Plaintiff requested a hearing before an

---

[1]For ease of reference and pursuant to the Court's Order [3] directing filing of briefs, the administrative record is cited to herein by reference to the Court's docket number and docket page number in the federal court record and not the Administrative Record page number.

Administrative Law Judge ("ALJ"). ([9] at  255-56).

On June 11, 2010, a hearing was convened before ALJ Charles C. Pearce. ([9] at 77-136.) The ALJ heard testimony from the Plaintiff and Vocational Expert ("VE") Don E. Woodall. On November 15, 2010, the ALJ issued a finding that the Plaintiff was not disabled. ([9] at 218-34.) The Plaintiff appealed this decision to the Appeals Council. ([9] at 275.) The Appeals Counsel remanded the case back to the ALJ for further proceedings, directing the ALJ to obtain additional evidence regarding the nature and severity of Plaintiff's mental impairments–impairments that Plaintiff did not allege initially, but were later raised during the pendency of his application. The additional evidence was to include an updated consultive mental status examination with cognitive testing, any additional available school records, updated treatment records and medical source statements. The ALJ was also directed to further evaluate the Plaintiff's mental impairments and further consider the Plaintiff's maximum residual functional capacity. Finally, the ALJ was directed to obtain additional evidence from a psychological medical expert and VE. ([9] at 237-38.)

On September 21, 2012, the ALJ held a second hearing. ([9] at 137-63.) VE Katrina Virden and the Plaintiff testified. A third, supplemental hearing was held on April 15, 2013. ([9] at 164-213.) The ALJ heard testimony from medical expert Edward Jasinksi, VE Katrina Virden, and the Plaintiff. The ALJ issued a decision on May 10, 2013, finding that the Plaintiff was not disabled. ([9] at 10-32.) Plaintiff filed a request for review to the Appeals Council on May 17, 2013. ([9] at 399-417.) The Appeals Council denied the request for review on July 17, 2014, thereby rendering the ALJ's decision as the final decision of the Commissioner. ([9] at 5-7.)

Plaintiff filed his complaint on August 18, 2014, requesting an order from this Court reversing or remanding the Commissioner's final decision and directing the Commissioner to award

benefits. *See* Complaint [1]. The Commissioner answered the complaint, denying that Plaintiff is entitled to any relief. *See* Answer [8]. In addition, the Commissioner filed a motion to affirm her final decision. *See* Motion [13] and Memorandum in Support [14]. Plaintiff also filed a motion for summary judgment. *See* Motion [10] and Memorandum in Support [11]. The parties having briefed the issues in this matter pursuant to the Court's Scheduling Order [3], the matter is now ripe for decision.

## MEDICAL/FACTUAL HISTORY

Plaintiff was forty two years old at the time of his alleged disability onset date. ([9] at 323.) Beginning in the 6th grade, the Plaintiff attended special education classes in school, although he also attended non-special education classes. The Plaintiff successfully completed high school. ([9] at 352-54.). He has twenty years experience working on an offshore oil rig. ([9] at 329.)  During his time as an offshore worker, the Plaintiff earned as much as $79,000 per year. The Plaintiff also has experience as a stock boy and dock worker. The Plaintiff initially alleged that he was unable to work due to spine disease, asthma, shortness of breath, and hemorrhoids. ([9] at 328.) The Plaintiff later alleged that he is disabled due to mental retardation.[2]

On June 8, 2010, the Plaintiff was examined by psychologist Kenneth Schneider, Ph.D. Dr. Schneider noted that the Plaintiff's speech stuttered and faltered throughout the interview, rendering him difficult to understand. Dr. Schneider opined that "[t]his is likely to be a limiting factor and partial explanation of what appears to be a lack of social involvement." The Plaintiff represented that

---

[2]The administrative record in this case contains voluminous medical documents from various providers. While these records reference multiple medical issues of the Plaintiff, the undersigned will outline only those records pertaining to the condition – mental retardation – the Plaintiff argues should have met or equaled a listed impairment.

he felt "defeated, melancholic, anhedonic, [un]motivated, avoidant [sic] of social involvement, [and] self-isolating." Dr. Schneider found that the Plaintiff was "completely oriented." The Plaintiff's writing was found to be malformed and filled with spelling errors, and Dr. Schneider found that the Plaintiff could not perform simple arithmetic calculations. The Plaintiff was able to perform a three-step command, but not a four or five-step command. Dr. Schneider found that Plaintiff remembers only three out of five items after a brief delay.

The Plaintiff completed an IQ test[3] with Dr. Schneider. His results were a verbal IQ of 60, a performance IQ of 62, and a full scale IQ of 57. Dr. Schneider opined that the Plaintiff performed at a "mild mental retardation level." Dr. Schneider diagnosed the Plaintiff with major depressive discover, pain disorder, mild mental retardation, lumbar spinal disease,[4] financial crisis, grief due to loss of family members, constant pain, and a global assessment functioning of 40.

Dr. Schneider concluded that "[Plaintiff's] mental retardation alone makes employment implausible." Furthermore, although Dr. Schneider is a clinical psychologist–not a medical doctor–he further opined that "[Plaintiff's] pain and spinal disease alone is occupationally disabling . . ." ([9] at 452-54.)

On September 15, 2010, the Plaintiff was examined by psychologist Dr. John A. Teal, Ph.D. Dr. Teal noted that the Plaintiff attended the appointment alone, and tended to work very slowly on the tasks of the various testing and showed signs of slow and poor comprehension. Dr. Teal also noted that the Plaintiff's speech was often rapid and difficult to understand, with some stuttering.

---

[3]Specifically, Dr. Schneider utilized the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III).

[4]It is noteworthy that the ALJ found the Plaintiff was not disabled due to lumbar disease. ([9] at 16.) The Plaintiff does not contest this portion of the ALJ's decision.

At the appointment, the Plaintiff confirmed that he completed high school, but stated that he had to repeat grades twice. When asked by Dr. Teal, however, the Plaintiff did not recall which grades he had to repeat. The Plaintiff stated that he stopped working in 2009 because he suffered from disc problems in his back. He also reported that he sometimes has difficulties with personal hygiene and grooming due to "back stiffness."  He denied any history of outpatient or impatient mental health treatment. The Plaintiff described his support group as his cousin, son, and friend. Although he stated that he primarily likes to stay at home, the Plaintiff reported that he sometimes visits his family, attends church regularly, and enjoys spending time with his son.

The Plaintiff completed a second IQ test with Dr. Teal.[5] His verbal IQ was 58, his perceptual reason IQ was 73, his working memory index was 63, his processing speed was 86, and his full scale IQ was a 60. Based on these results, Dr. Teal opined that Plaintiff tended to function intellectually between the borderline and mentally deficient range. The Plaintiff also completed a wide range achievement test, or WRAT-IV, in which he scored a 55 in word reading, a 55 in spelling and a 63 in math computation. Dr. Teal opined that the Plaintiff achieved consistently in the low range, but that with remedial training, he could likely achieve at a higher level.

Dr. Teal diagnosed the Plaintiff with borderline intellectual functioning, history of special education, and slow learning. Specifically, Dr. Teal opined:

> Particularly on tasks with nonverbal reasoning, the claimant scored into the borderline range. Based on this ability, as well as his long history of successful employment, this claimant appears more appropriately diagnosable as functioning in the borderline range of intellectual functioning than in mentally retarded range. He clearly displayed good adaptive deficits to be able to maintain employment for that long. The claimant showed some mild dysphoria secondary to his situation in life and to his back stiffness, yet he does not appear to warrant the diagnosis of any

---

[5]Dr. Teal utilized the WAIS-IV.

full-fledged mood disorder at this time and he is not taking any psychotropic medication. In light of these factors, the decision as to whether this claimant could function in a work setting is more likely based on whether he could handle employment from a physical standpoint. As to whether his back problems and spinal problems preclude him from employments, this will have to be decided by some other professional. As far as his mental capacity is concerned, the claimant appears capable of handling the same type of employment he has managed in the past.

([9] at 457-59.)

On October 27, 2011, the Plaintiff began treatment at the Southwest Mississippi Mental Health Complex ("SMMH"), complaining of depression and anxiety. ([9] at 471.) At the Plaintiff's next visit on December 10, 2011, Plaintiff complained of problems sleeping and auditory and visual hallucinations. However, it was noted that the Plaintiff was "vague in description" of his hallucinations. He was prescribed Celexa,[6] an antidepressant, and Haldol, a antipsychotic.[7] On February 21, 2012, the Plaintiff stated that he was sleeping better and not having any hallucinations. ([9] at 477.) There are no additional records from SMMH past February, 2013.

The Plaintiff attended a third psychological consultative examination on May 8, 2012, with clinical psychologist Dr. L. Wilbourn. The Plaintiff was accompanied by his cousin Francheska Anthony, who was also interviewed at the appointment. It appears from Dr. Wilbourn's report that Anthony answered many questions directed to the Plaintiff. For instance, the Plaintiff was asked

---

[6]Celexa is in a class of antidepressants called selective serotonin reuptake inhibitors. It is also known commonly known as Citalopram. *See* Citalopram, MedlinePlus, United States Library of Medicine, *available at* https://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html.

[7]Also known as Haloperidol, Haldol is an antipsychotic used to treat nervous, emotional, and mental conditions. *See* Haldol - haloperidol lactate injection, DailyMed, United States Library of Medicine, *available at* http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=27cfe684-7d11-4f37-9c8b-b2bdd6b5 348e.

about his living situation, and reported that he and his mother "get along alright." Anthony then interjected, stating that the Plaintiff "sometimes has to be instructed to bathe and brush his teeth."

The Plaintiff reported that he does no housecleaning, cooking, or laundry. He stated that he knew how to drive but rarely does so. The Plaintiff also reported that he attends church, has friends who visit him, and enjoys walking. In regard to possible mental disorders, the Plaintiff reported suicidal thoughts, but denied any suicide attempts. He stated that his customary mood is unhappy and nervous, which Anthony confirmed. Plaintiff indicated that he hears voices once very two days, but denied visual hallucinations.

Dr. Wilbourn reported that the Plaintiff was neat and clean in appearance, courteous, and cooperative. His speech was audible, but halting and pressured. Dr. Wilbourn stated that Plaintiff's demeanor was odd and he appeared easily upset. Dr. Wilbourn stated that it was difficult to obtain specific information from the Plaintiff. Dr. Wilbourn opined that Plaintiff had fair judgment, but his concentration was poor to fair. The Plaintiff's persistence was poor to fair, and his pace of response was average. His ability to remember remote events was fair to good, and his recent recall was fairly good. The Plaintiff was oriented in regard to person, place, time and situation, except that he stated the current year was 2013 instead of 2012.

Dr. Wilbourn diagnosed the Plaintiff with mild mental retardation, depressive disorder with psychotic features, and anxiety disorder. However, there is no indication that Dr. Wilbourn performed any specific testing, such as an IQ test, to support his diagnoses. ([9] at 533-36.)

As outlined above, the ALJ conducted the first hearing on June 11, 2010. At the hearing, the Plaintiff testified that his only function at his prior job was to watch a gauge on an offshore oil rig and write down the pressure readings. The ALJ then referenced the Plaintiff's initial disability

application, in which he represented that his former job required opening pipes, lines and wells, completing paper work, using technical knowledge, and using machinery.[8] When the ALJ inquired into this discrepancy, the Plaintiff was unable to offer any explanation. Despite the alleged simple nature of the Plaintiff's employment, he completed a week of training before beginning his job offshore. The Plaintiff stated that once his job was explained to him, he understood his duties and could perform them. He testified that he would be glad to return to work were it not for his back pain.

The Plaintiff's testimony also indicated that although he previously lived with his girlfriend, and currently lives with his mother and son,  he did live alone for a period of time. The Plaintiff testified that during the time he lived alone, he was able to manage his own finances, including financing several automobiles and maintaining a bank account. The Plaintiff also testified that he was able to pay his rent and procure automobile insurance. The Plaintiff did not indicate that he had difficulties in caring for his personal needs or other typical activities of daily living. ([9] at 77-136.)

On September 21, 2012, the ALJ conducted a second hearing. The Plaintiff clarified that he performed other tasks at work in addition to watching the gauge, such as opening pipes and assisting a mechanic in repairing an air compressor, but that he performed all tasks under supervision. The Plaintiff testified that this included his gauge-watching duties, in that someone would always stand behind him and read out the numbers for the Plaintiff to write down. The Plaintiff testified that he obtained a driver's license by completing an oral examination, as his reading and writing skills are

---

[8]In his initial disability report, the Plaintiff stated that he was a "Lead Operator" on an oil rig. The Plaintiff stated that this job involved opening pipes and lines, paperwork, opening wells, and working on compressors. He further stated that this job included using machines, tools and equipment, using technical knowledge or skills, and writing reports. ([9] at 329.)

poor. ([9] at 137-63.)

A third hearing was held April 15, 2013. At this hearing, the Plaintiff's testimony indicated that he never lived alone as an adult, and that at all times he either lived with his girlfriend or mother.  He testified that his cousin supervised him for the entirety of his career as an offshore worker, which is why he was afforded special accommodations. ([9] at 164-213.)

## **BURDEN OF PROOF**

In *Harrell v. Bowen*, the Fifth Circuit detailed the shifting burden of proof that applies to disability determinations:

> An individual applying for disability and SSI benefits bears the initial burden of proving that he is disabled for purposes of the Social Security Act.  Once the claimant satisfies his initial burden, the [Commissioner] then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and therefore, not disabled.  In determining whether or not a claimant is capable of performing substantial gainful activity, the [Commissioner] utilizes a five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1988):
>
> 1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
>
> 2.  An individual who does not have a 'severe impairment' will not be found to be disabled.
>
> 3.  An individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.
>
> 4.  If an individual is capable of performing the work he has done in the past, a finding of 'not disabled' must be made.
>
> 5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity[9] must be considered to determine if other work can be performed.

---

[9] "Residual Functional Capacity" is defined in the Regulations as the most an individual can still do despite the physical and/or mental limitations that affect what the individual can do in a work setting. 20 C.F.R. § 416.945.

862 F.2d 471, 475 (5th Cir. 1988). The claimant bears the burden at the first four steps, but the burden thereafter shifts to the Commissioner at step five. Once the Commissioner makes the requisite showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart,* 415 F.3d 457, 461 (5th Cir. 2005). A finding that a claimant "is disabled or not disabled at any point in the five-step process is conclusive and terminates the . . . analysis." *Harrell,* 862 F.2d at 475 (citations omitted).

## ADMINISTRATIVE LAW JUDGE'S ANALYSIS

As an initial matter, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015.[10] At step one of the evaluation,[11] the ALJ found that Plaintiff had not engaged in substantial gainful employment since March 24, 2009, the alleged onset date. At step two, the ALJ found that Plaintiff suffered from the following severe impairments: impaired intellectual ability and an affective disorder. The ALJ found that the Plaintiff's back pain and asthma were not severe. ([9] at 16.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Part 4, Subpart P, Appendix 1. ([9] at 17-24.) Specifically, the ALJ found that Plaintiff did not suffer from an intellectual disability as set forth in Listing 12.05.

In order to make a determination at step four, the ALJ assessed Plaintiff's Residual Functional Capacity ("RFC"). The ALJ found that:

[T]he claimant has the residual functioning capacity to perform a full range of work

---

[10]Although there were two decisions issued by the ALJ, the undersigned will only outline the second, as that is the decision appealed by the Plaintiff.

[11]The ALJ applied the evaluation process set forth in 20 C.F.R. §§ 404.1520(b)-(f) and 416.92(a).

at all exertional levels but with the following nonexertional limitation: the claimant cannot perform complex job instructions and its restricted to the performance of simple well-defined tasks with simple job instructions and simple work decisions. The claimant can interact occasionally with the general public but cannot deal with the public as a customer. He is capable of adjusting to a work routine provided the work is not complex or highly exacting. The claimant is capable of working around others without distracting them or being distracted by them. He cannot supervise the work of others.

([9] at 24.) At step four, the ALJ found that Plaintiff was not capable of performing his past relevant work as a gauge operator, not because of specific findings of the Plaintiff's mental capacities, but because the record lacked a clear and credible description of the Plaintiff's former job duties. ([9] at 26.) Finally, at step five, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy, including an auto detailer, dishwasher, and dining room attendant or table busser. ([9] at 26-27. ) Accordingly, the ALJ found that Plaintiff was not disabled. ([9] at 27.)

## STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to inquiry into whether there is substantial evidence to support the Commissioner's findings and whether the correct legal standards were applied in evaluating the evidence. *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir. 1983). To be substantial, the evidence "must do more than create a suspicion of the existence of the fact to be established." *Id.* However, "[a] finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (internal citations and quotations omitted). Conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Selders v. Sullivan,* 914 F.2d 614, 617 (5th Cir. 1990). A court may not reweigh the evidence, try the issues

*de novo*, or substitute its judgment for the Commissioner's, "even if the evidence preponderates against" the Commissioner's decision. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). If the decision is supported by substantial evidence, it is conclusive and must be affirmed. *Selders,* 914 F.2d at 617. Moreover, "[p]rocedural perfection in administrative proceedings is not required' as long as 'the substantial rights of a party have not been affected." *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (internal quotations omitted).

## ANALYSIS

Plaintiff has raised three assignments of error: (1) substantial evidence does not support the finding of the ALJ regarding Listing 12.05B or 12.05C; (2) substantial evidence does not support the ALJ's findings regarding adaptive functioning and the impact of prior work; and (3) the ALJ did not apply the appropriate legal standard in finding that Plaintiff does not suffer from deficits of adaptive functioning.

### *Issue No. 1: Whether substantial evidence supports the ALJ's findings regarding Listing 12.05B or 12.05C.*

As outlined above, the ALJ found that the Plaintiff's impairments did not meet or equal Listing 12.05, which provides as follows:

12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with **deficits in adaptive functioning** initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements of A, B, C, or D are satisfied.
 . . . .

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or

other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05 (emphasis added). In order to satisfy this listing, a social security claimant must meet the preliminary substantive requirement ("significantly subaverage intellectual functioning with deficits in adaptive functioning"), the temporal requirement ("initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22"), and one of the four severity prongs (paragraphs A, B, C and D). *Randall v. Astrue*, 570 F.3d 651 (5th Cir. 2009). The Fifth Circuit has also expressly recognized that some claimants may satisfy the specific severity criteria but not the general diagnostic requirement. *Id.* at 659 n. 15.

In his decision, the ALJ specifically found that the Plaintiff did not fulfill the substantive and temporal requirements of Listing 12.05, as the Plaintiff did not have deficits in adaptive functioning prior to age 22. The ALJ also found that the Plaintiff did not meet the severity requirements as set forth in paragraphs B or C.

The Plaintiff argues that the evidence of record demonstrates that he was involved in special education, which suggests that he did have deficits in adaptive functioning before age 22. The Plaintiff also argues that two of the three clinical psychologists that examined him made a diagnosis of mild mental retardation. The Plaintiff states that he achieved IQ scores as low as 57, which would qualify as severe under paragraph B. Finally, the Plaintiff argues that he meets the severity requirements of paragraph C because in combination with his IQ scores, the ALJ found he suffered from "affective disorder."

As outlined above, this Court's review of the Commissioner's decision is limited to inquiry into whether there is substantial evidence to support the Commissioner's findings. *Hollis*, 837 F.2d

at 1382. A finding of no substantial evidence is appropriate "only if no credible evidentiary choices or medical findings support the decision." *Boyd*, 239 F.3d at 704.

The Court finds that the ALJ's determination is supported by substantial evidence demonstrating that Plaintiff does not fulfill the requirements of Listing 12.05. The record reflects that the Plaintiff has lived alone as an adult, during which time he was able to pay his bills, maintain a bank account, and obtain financing on several automobiles. There is no indication in the record that the Plaintiff cannot take care of his personal needs on the basis of mental retardation. While the Plaintiff did mention that he experiences difficultly at times with personal hygiene, he ascribed this difficulty to back stiffness as opposed to mental incapacities. ([9] at 457-59.)[12] The Plaintiff stated at the second hearing that he does not do household chores, but again explained that this was due to his back pain. ([9] at 147.) The record also suggests the Plaintiff has a fairly active social life. Specifically, the Plaintiff stated at his appointment with Dr. Teal that he has friends who visit him and that he attends church regularly. The Plaintiff also testified that he enjoyed spending time with his adult son. ([9] at 457-59.)

The record further reflects that the Plaintiff has an extensive work history. *See Witt v. Barnhart*, 446 F. Supp. 2d 886, 895-96 (N.D. Ill. 2006) ("SSA regulations indicate that, in the context of mental retardation, an ability to hold a job is particularly useful in determining the individual's ability or inability to function in a work setting."). As outlined above, the Plaintiff worked on an offshore oil platform for the same employer[13] for nearly twenty years. In the last five

---

[12]Dr. Wilbourn noted that the Plaintiff needs to be reminded to brush his teeth and bathe, but this comment was made by his cousin, and not by the Plaintiff.

[13]Although the name of company changed throughout the years, the Plaintiff testified that his actual employer remained to be the same entity.

years of his employment, the Plaintiff's annual income averaged approximately $74,607. ([9] at 307.) The ALJ reasoned that the fact the Plaintiff worked for the same employer for many years suggested he had no difficulty in performing his tasks adequately. ([9] at 20.)

The ALJ noted that the Plaintiff was able to participate in training and learn the necessary information in order to successfully perform his work as an offshore operator for many years. At the hearing held in June 2010, the Plaintiff testified that he would be capable of returning to work, and would be glad to return to work, if his back pain subsided. The  Plaintiff also exhibited confidence in his abilities to perform his duties in a dangerous environment, as he testified that he was capable of maintaining his concentration on the pressure gauges because he knew that it was important for the safety of the entire crew.

Although the Plaintiff submitted several third party statements suggesting that he required significant accommodations in his offshore employment, there was also evidence in the record that the Plaintiff received no special accommodations. Ricky Andrews, who stated he is the Plaintiff's cousin, asserted that he "worked with" the Plaintiff at all times because he was "slow." ([9] at 366.) Maurice Williams stated that the Plaintiff required special supervision, but his statement also described the Plaintiff performing tasks, such as working with a mechanic on active wells, that the Plaintiff specifically denied performing at the hearings. ([9] at 381-82.)

Sherry Johnson, who claimed to be the Plaintiff's brother, also submitted a statement, but he did not state that the Plaintiff received special accommodations. Johnson did describe the Plaintiff's job title as "production operator," which appears inconsistent with the Plaintiff's alleged menial job duties. ([9] at 383.) Furthermore, the Plaintiff's former employer submitted a statement asserting that the Plaintiff worked as an "A operator" and received no special accommodations. The

employer further stated that they do no afford any special accommodations for their offshore employees. ([9] at 359.)

Finally, the ALJ noted that prior to his career as an offshore worker, the Plaintiff worked as a stock boy and dock worker, and yet the Plaintiff makes no allegations that he was afforded or required special accommodations in those positions. ([9] at 21.)

The Court acknowledges the conflicting evidence in this case as to whether the Plaintiff received special accommodations by his employer. However, such conflicts must be, and were, resolved by the Commissioner, who found the statements of the Plaintiff's brother and former employer to be more credible. See *Selders*, 914 F.2d at 617 (holding that conflicts in the evidence are for the Commissioner, not the courts, to resolve).

The Plaintiff also argues that two of the three clinical psychologists who examined him diagnosed the Plaintiff with mild mental retardation, while the third diagnosed him with borderline intellectual functioning. The ALJ thoroughly discussed the report of each psychologist. Dr. Wilbourn concluded that the Plaintiff was mildly mentally retarded. However, Dr. Wilbourn's conclusion did not appear to be based on any objective clinical findings, as there is no mention that Wilbourn reviewed any prior examination findings or medical records, and performed no diagnostic tests of his own. The ALJ also noted that the Plaintiff attended the appointment with his cousin, who answered many of the questions posed by Dr. Wilbourn. In light of this information, the ALJ concluded that Dr. Wilbourn's findings were unpersuasive, as they were based almost solely on the subjective complaints of the Plaintiff and those voiced on his behalf. ([9] at 22; 533-36.)

Dr. Schneider concluded the Plaintiff was profoundly depressed and mildly mentally retarded. However, Dr. Schneider also opined that the Plaintiff is disabled solely on the basis of his

back pain, despite the fact that Dr. Schneider is a clinical psychologist and not a medical doctor. The ALJ found this conclusion troubling:

> [Dr. Schneider's] opinion of physical disability is at odds with treating sources and the state agency medical doctors and is of no value. However, the fact that the psychologist opines that the claimant's physical problems "alone" are disabling suggests he has stepped away from the role of examining psychologist and stepped into the role of advocate. This casts doubt on the objectivity of his other "findings."

([9] at 25.)

The third consulting psychologist, Dr. Teal, concluded the Plaintiff had borderline intellectual functioning. The ALJ placed great weight in Dr. Teal's opinion because he found the Plaintiff "lacked the type of adaptive functioning deficits that would . . . support the diagnostic impression of mild retardation . . . [and that] his longitudinal history was most consistent with borderline intellectual functioning." ([9] at 23.) Following a detailed analysis of the Plaintiff's work history and ability to take care of his personal needs, the ALJ further noted the Plaintiff has no diagnosis of mental retardation by a treating source, and that when the Plaintiff initiated his disability claim, there was no suggestion of mental retardation.

The ALJ noted the disparity between the evaluations of Dr. Schneider and Dr. Teal, and decided to give deference to Dr. Teal because he was found to be more credible and his findings were consistent with the other evidence of record. Although these differing opinions do create a discrepancy, such a conflict is properly resolved by the Commissioner and not the court. *Selders*, 914 F.2d at 617.[14]

---

[14]As for the Plaintiff's arguments that his IQ test results qualify him under the severity paragraphs B and C of Listing 12.05, the Fifth Circuit has clearly stated that some claimants may satisfy the specific severity criteria of Listing 12.05, but not the general diagnostic requirement of deficits in adaptive functioning, and thus do not fulfill the requirements of the listing. *Randall*, 570 F.3d at 659 n. 15.

The Plaintiff reiterates that his placement in special education courses during childhood proves the onset of a mental impairment before age 22. While this is relevant evidence, placement in special education courses is in no way dispositive of whether an individual has an intellectual disability as defined by Listing 12.05. *See Thompson v. Astrue*, 2012 WL 7062342, at *10 (E.D. La. Aug. 13, 2012) ("[M]ere attendance of special education classes is insufficient to establish significantly subaverage intellectual functioning with deficits in adaptive behavior during the developmental period."); *see also Hayes v. Comm'er of Social Sec.*, 357 Fed. App'x 672, 676 (6th Cir. 2009) (holding that poor academic performance alone does not warrant a finding of onset of subaverage intellectual functioning during age 22).

The ALJ's decision included a thorough discussion of the Plaintiff's education, activities in daily living, and considerable work history. The ALJ also noted that the Plaintiff was not placed in special education classes until sixth grade. The ALJ further noted that while the Plaintiff took some special education classes, he also participated in many regular classes. The Plaintiff's records do not reflect that he repeated any grades,[15] and he successfully completed high school within the normal time frame. ([9] at 19-20; 352-53.)  The Plaintiff took drivers education in high school and passed an oral driver's test. He is able to drive, though he claims he ceased driving a few years ago. In sum, the ALJ weighed the Plaintiff's history of special education along with the other evidence of record, and determined that he did not meet the substantive requirements of Listing 12.05. As outlined above, a court may not reweigh the evidence or substitute its judgment for the Commissioner's.

---

[15]One record states that the Plaintiff was not "promoted" following the fifth grade; however, the same record shows the Plaintiff returning to school the next year and finishing high school within the normal period of time. Also, the Plaintiff stated at his appointment with Dr. Teal that he had to repeat grades, but when pressed, he did not recall which ones. ([9] at 455.)

*Harrell*, 862 F.2d at 475.[16]

For the reasons set forth above, the undersigned finds that the ALJ's decision was supported by substantial evidence. Accordingly, the Commissioner's decision in this regard must be affirmed.

*Issue No. 2: Whether substantial evidence supports the ALJ's findings regarding adaptive functioning and the impact of prior work.*

The Plaintiff states in a conclusory fashion that the ALJ placed too much weight on the work history of the Plaintiff in finding that the Plaintiff did not suffer from deficits in adaptive functioning. However, as outlined above, the ALJ based his finding on a myriad of considerations, including the Plaintiff's education, social life, and ability to perform daily tasks. Furthermore, "evaluation of work and work attempts is highly relevant to the determination of disability." *Blancas*, 690 F. Supp.2d at 482 (W.D. Tex. 2010). Accordingly, the undersigned finds this argument to be without merit, and in this regard, the Commissioner's decision should be affirmed.

*Issue No. 3: Whether the ALJ failed to apply the appropriate legal standard in finding that Causey does not suffer from deficits in adaptive functioning.*

The Plaintiff argues that the ALJ erred at step three because he failed to utilize the correct standard in determining the Plaintiff did not suffer from deficits in adaptive functioning, as set forth in Listing 12.05.

---

[16]The ALJ also addressed the discrepancies in the Plaintiff's testimony between his initial application and his testimony at the three hearings. Most notably, the Plaintiff's accounts of the nature of his former job duties and his history of living alone changed dramatically. The ALJ's decision states: "The disparity between the claimant's testimony during the three hearings as well as with the other evidence of record is concerning and fails to suggest that the statements were in error or an oversight but is highly suggestive of a deliberate attempt to mislead. The claimant's credibility suffers accordingly." ALJ opinion [9] at 25.

The term "adaptive functioning" generally refers to the day-to-day activities of independent living. The Plaintiff asserts that although Listing 12.05 does not define the term "deficits of adaptive functioning," this requirement is defined in the April 2002 Federal Register publication "Technical Revisions to Medical Criteria for Determinations of Disability." *See* 67 Fed. Reg. 20,018, 20,022 (2002). This publication acknowledges four possible definitions and methods[17] of assessing "deficits in adaptive functioning" used by major professional organizations, but does not adopt any particular one. Plaintiff argues that this 2002 publication not only permits, but requires ALJs to use one of the four definitions recognized within.

Plaintiff cites *Barnes v. Barnhart*, a case from the United States Court of Appeals for the Tenth Circuit, in support of his argument. 116 Fed. App'x 934, 942 (10th Cir. 2004). In *Barnes*, the court found that the ALJ had "essentially improvised his own definition for 'deficits in adaptive functioning,'" which was not supported by the evidence. In remanding the case, the court directed the ALJ to "choose a standard consistent with the Commissioner's directive" as set forth in the Federal Register. *Id.*

The Plaintiff argues that in this case, as in *Barnes*, the ALJ erred in his analysis of the Plaintiff's adaptive functioning by failing to choose and apply one of the recognized methods of measurement.

---

[17]For example, the American Psychiatric Association requires "significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." 67 Fed. Reg. 20018-01, at 20,022 (quoting the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) ("DSM-IV"). The American Psychological Association, however, requires "significant limitations in adaptive functioning, which exists concurrently," as defined by "a summary index score that is two or more standard deviations below the mean." *Id.* (*quoting* Manual of Diagnosis and Professional Practice in Mental Retardation, 1996).

A review of the ALJ's decision reveals that he indeed failed to specify any one method in determining the Plaintiff did not suffer from deficits in adaptive functioning. While the ALJ referenced criteria included in the four possible definitions, including the Plaintiff's long work history and ability to live alone, manage his own finances, and care for his personal needs, no one method was adopted in full. The Plaintiff is also correct that multiple courts, with the notable exception of the Fifth Circuit, have determined that an ALJ cannot use an "improvised definition" for evaluating a claimant's deficits in adaptive functioning. *See, e.g., Blancas v. Astrue*, 690 F. Supp. 2d 464, 483 (W.D. Tex. 2010); *Durden v. Astrue*, 586 F. Supp. 2d 828, 840 (S.D. Tex. 2008).

However, multiple courts have also held that an ALJ's improvised approach does not by itself require reversal. *See Turner v. Astrue*, 2012 WL 5389679, at *6 (N.D. Tex. Nov. 2, 2012); *Blancas*, 690 F. Supp. 2d at 480 ("The lack of a clear standard for measuring deficits in adaptive functioning is not problematic in [] clear cut cases, but creates difficulties in borderline cases[.]"); *Hyatt v. Astrue*, 2013 WL 527820 (S.D. Miss. Jan. 25, 2013) ("Particularly in a case in which the evidence of adaptive functioning is ambiguous, the failure of the ALJ to articulate and apply a meaningful measure of adaptive functioning warrants remand."). Rather, "[w]hen it is apparent that the claimant does not have deficits in adaptive functioning, many courts . . . have affirmed such a finding despite the ALJ's failure to articulate a standard." *Turner*, 2012 WL 5389679 at *6.

The undersigned finds the ALJ's failure to specify any one method for determining deficits in adaptive functioning is not fatal to the Commissioner's decision, as this action is not among the "borderline cases" warranting such specific delineation. *Blancas*, 690 F. Supp. 2d at 480. As outlined above, the ALJ's decision regarding the Plaintiff's adaptive functioning was thoroughly reasoned and supported by substantial evidence. Furthermore, the facts of the cases the Plaintiff cites

in support of his argument differ considerably from the case at hand. In those cases, the claimants failed to complete middle school, *see Durden*, 586 F. Supp.2d 828, could not perform daily tasks such as cooking and driving, *see Turner*, 2012 WL 5389679, and had previously received benefits on the basis of mental retardation. *Blancas*, 690 F. Supp. 2d at 473. In this case, the Plaintiff completed high school, obtained a driver's license, is able to take care of his personal needs and manage his finances. He has an extensive work history with the same employer for over twenty years, and the record does not indicate that Plaintiff was diagnosed with mental retardation during the developmental period.

Finally, the undersigned notes that the Fifth Circuit does not require a specific measurement of "adaptive functioning" to be utilized by the ALJ.[18]

Accordingly, for these reasons, the undersigned finds  that the Commissioner's decision should be affirmed in this regard.

## CONCLUSION

For the reasons set forth above, the Court finds that the Motion to Affirm the Commissioner's Decision [13] should be GRANTED, and the denial of benefits affirmed.

IT IS, THEREFORE, ORDERED that:

1.      The Motion for Summary Judgment [10] filed by the Plaintiff is DENIED;

2.      The Motion to Affirm the Commissioner's Decision [13] filed by the Defendant is

---

[18]In *Randall*, the Fifth Circuit upheld the ALJ's denial of benefits based on the following findings of a clinical psychologist: "[The claimant] could cook, clean, communicate, manage time, and travel independently; she was alert and responsive; and she possessed good receptive and expressive skills for everyday conversational purposes, good social skill, good abilities to attend and concentrate, good judgment and reflective cognition, and fair reasoning." 570 F.3d at 654.

GRANTED;

3.     The Complaint [1] is dismissed with prejudice and the denial of benefits affirmed; and

4.     That a separate judgment in accordance with Federal Rule of Civil Procedure 58 will be filed herein.

SO ORDERED this the 22nd day of December, 2015.

s/ Michael T. Parker
United States Magistrate